UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:11-CV-160-H

PATRICIA A. RAGLAND McGEHEE, et al.                                     PLAINTIFFS

V.

U.S. ARMY CORPS OF ENGINEERS, et al.                                    DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

Plaintiffs have asked the Court, under Federal Rule of Civil Procedure 59(e), to alter or amend the Court's order denying Plaintiffs' first motion for a preliminary injunction. Plaintiffs have provided insightful arguments. Several factors complicate consideration of injunctive relief: the law is not completely settled, the facts of the situation are not entirely known and the timing of the request is so late in the construction of the roadway. Due to these factors, the Court has carefully reconsidered each of Plaintiffs' arguments.[1]

I.

The Court will not recite the full facts of the case and instead refers to its previous opinion. Basically, the Kentucky Transportation Cabinet (the "Cabinet") has condemned Plaintiffs' home and supporting structures, which are registered on the National Register of Historic Places, to build the Ring Road Extension Project (the "Project"). Plaintiffs have fought the condemnation and pending eviction in state court and now here. In this Court, the basis of Plaintiffs' arguments is that they were due and did not receive a Section 106 of the National

---

[1] At the same time, the Court has considered Plaintiffs' separate and second request for injunctive relief. A Memorandum Opinion and Order as to that motion is filed today as well.

Historic Preservation Act ("NHPA") Process ("Section 106 Process") prior to the U.S. Army Corps of Engineers issuing certain Nationwide Permits ("NWP").

For the most part, Plaintiffs repeat their previous arguments. The strongest underlying arguments are that the Court: (1) improperly defined an "undertaking" under NHPA within the Project; (2) erred in determining that redesign of the project did not equate to unlawful segmentation; (3) wrongly concluded that the McGehee home would not be within the Area of Potential Effects ("APE") of NWP No. 33 for a temporary crossing for construction of the Valley Creek Bridge; and (4) committed clear legal error by concluding that Plaintiffs received any part of the Section 106 Process due. The Court will address each argument in turn.

A motion to alter or amend a judgment may be granted "only if there was '(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice.'" *Am. Civil Liberties Union of Ky. v. McCreary Cnty., Ky.,* 607 F.3d 439, 450 (6th Cir. 2010) (quoting *Intera Corp. v. Henderson,* 428 F.3d 605, 620 (6th Cir. 2005)). Plaintiffs argue the Court committed clear legal error and that the previous order will result in manifest injustice.

## II.

The Court has held that the entire Project is not an undertaking as defined in the NHPA. Plaintiffs essentially argue that the Court improperly applied the definition of undertaking to the Project.

Under NHPA, an "'[u]ndertaking' means a project, activity or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including . . . those requiring a Federal permit license, or approval. . ." 16 U.S.C. §470w(7). While Plaintiffs make

much of the fact that the Court used the term "federal undertaking," rather than "undertaking," the Court finds no relevance in the distinction. The Court was merely trying to clarify activities attributable to the federal government, as opposed to those of state government.

More importantly, Plaintiffs argue that because an undertaking is defined as "a project, activity or program" that requires a federal permit, the entire Project constitutes the federal undertaking here. The U.S. Army Corps of Engineers issued NWP No. 14 and NWP No. 33 in conjunction with the Project. Anyone whose activities impact the waters of the United States must obtain such a permit. Here, these permits allowed construction of both permanent and temporary stream crossings. Plaintiffs conclude, without any supporting case law, that where a "project" requires a federal permit, as here, the "undertaking" is the entire Project. The Project has insufficient federal involvement to make it an "undertaking" as a whole. The Court concluded that each bridge, culvert or temporary crossing that required a permit was a separate "project" or "undertaking." The Court continues to believe that its analysis is correct.

Plaintiffs state that the Court's definition of "undertaking" has allowed the Cabinet to unlawfully segment the Project. In other words, by limiting the federal undertakings to the crossings requiring federal permits, the Court has separated the crossings from the rest of the road project, allowing the Cabinet to avoid compliance with federal regulations. However, this Court, similar to others, have previously concluded that the issuance of federal permits or federal funding for limited portions of a project, does not make the entire project a federal undertaking for purposes of the NHPA. *Harrison v. U.S. Dept of Army*, No. 3:08CV-105-H, 2009 WL 3347109, at *6 (W.D. Ky. Oct. 14, 2009); *Historic Pres. Guild of Bay View v. Burnley*, 896 F.2d 985 (6th Cir. 1980); and see *Sw. Williamson Cnty. Cmty. Ass'n, Inc. v. Slater*, 243 F.3d 270 (6th

3

Cir. 2001) (addressing claims under the National Environmental Policy Act). In other words, the Court is not alone in concluding that federal and non-federal undertakings may co-exist within one project without the project being unlawfully segmented.

Common sense suggests that this Court and others are correct in this view. There is no other way to reconcile Plaintiffs' proposed broad definition of an "undertaking" within NHPA with the realities of road construction. Under this Court's reading, compliance with federal law is required for any singular undertaking, allowing for fairly broad application of federal law to local projects. However, by Plaintiffs' definition, the presence of any one "undertaking" within a road would federalize the entire project. It would be nearly impossible to construct a road governed primarily by state law. Congress has not stated its intent for such a universal federal regulation of state road projects.

To be sure, where federal involvement is sufficient in a state project, the entire project can be deemed a federal undertaking. This is most often true where federal funding supports a project. The Court applied the *Slater* test to determine whether there were sufficient federal undertakings here to federalize this state-funded road. While the Court recognizes that *Slater* concerned the National Environmental Policy Act ("NEPA") and its corresponding term "major federal action," the NEPA analysis has been applied to NHPA by this Court and others. *Harrison,* 2009 WL 3347109, at *6. As such, the determination that the Project had insufficient federal involvement to federalize the entire road was not clear error of law.

### III.

The Court has held that the redesign of the Project to replace two culverts with clear spans eliminates any federal permit requirement and, thus, eliminates any federally required

4

Section 106 Process.[2] Plaintiffs argue that the Cabinet redesigned the final two crossings to avoid compliance with federal regulations and therefore amounted to unlawful segmenting.

This Court has not found any case clearly suggesting that the architectural redesign of a project to avoid the need for federal permits amounts to unlawful segmentation.[3] In fact, some case law suggests that to design a project so as to avoid federal jurisdiction or regulations is appropriate. *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 n. 8 (D.C.Cir. 2003) (discussing *Macht v. Skinner*, 916 F.2d 13 (D.C.Cir. 1990)). For the reasons that follow, the Court believes that its initial reasoning was correct.

Plaintiffs rely heavily on *Committee to Save Cleveland's Huletts v. US Army Corps of Engineers,* 163 F.Supp.2d 776 (N.D. Ohio 2001). *Huletts* is neither binding nor persuasive in our circumstances. Most important, it does not articulate a clear legal principle that is applicable here. In that case, the defendants did not redesign their project, but instead limited the scope of the dredging that required a Corps' permit. In other words, the defendants were not avoiding Corps' jurisdiction, but were arguably misrepresenting the scope of their plans. Here, a Corps' permit was no longer necessary or required. Furthermore, the crux of the court's decision in *Huletts* seemed to rest on the idea that, once initiated, the 106 process should be completed before the Corps issued a permit.

Presumably, the Cabinet redesigned the Project at least in part to limit the necessity of

---

[2] It is quite possible that Plaintiffs' historic residence would have been considered within the APE of the culvert crossing nearest the residence.

[3] The Court should point out that such a physical redesign presents an entirely different question than a design which attempts to segment or separate a federally funded portion of a project from a non-federally funded portion. *See Historic Pres. Guild of Bay View v. Burnley, supra.* The classic case of unlawful segmenting occurs where officials divide a project into separate components or contracts to avoid requirements of NEPA or NHPA. That did not occur here.

5

obtaining additional Corps' permits. Everyone agrees that the design change eliminated the direct requirement of a Corps' permit. The Court finds no case suggesting that this is impermissible in these circumstances.

IV.

A federal permit was never required for the Valley Creek Bridge even though it was listed on the original NWP No. 14 request. It was always designed as a clear span. NWP No. 33 covered only certain temporary construction at the bridge site. Plaintiffs argue that the Court erred in determining that the McGehee home would not have been within any APE of the temporary construction crossing at Valley Creek Bridge. Plaintiffs argue that the Court's conclusions make a "mockery" out of the Section 106 Process. Unless NHPA's purpose is to make every state road project an undertaking for purposes of that Act, the Court disagrees. The Court remains convinced that its original conclusion was clearly dictated by the federal regulations and was not clear legal error.

The first step in the Section 106 Process is to determine whether the temporary construction would have "the potential to cause effects on historic properties." 36 CFR §800.3(a). A "no potential to cause effects" determination terminates the Section 106 Process. 36 CRF § 800.3(a)(1). Here, the temporary construction which NWP No. 33 permitted could not possibly have any impact whatsoever on the historic property. Only if the permitted work had the potential to cause effects must the Section 106 Process continue. *Id.* Consequently, the Corps of Engineers did not abuse its discretion by making its "no potential to cause effects" determination.

Plaintiffs confuse the "no potential to cause effects" determination with a "no effects"

determination. A "no effects" determination, like a delineation of the APE happens further along in the Section 106 Process. 36 CFR § 800.4. The Court, therefore, had no need to discuss the APE of the NWP No. 33 construction because no such determination was required. *See Save Our Heritage, Inc. v. Fed. Aviation Admin.,* 269 F.3d 49, 62 (1st Cir. 2001).

V.

Finally, Plaintiffs argue that the Court committed a manifest injustice when it concluded that Plaintiffs were not due any more of the Section 106 Process as to the issuance of NWP No. 14. This argument is closely related to that which the Court has already reconsidered in Section III and IV of this Memorandum.

The Corps of Engineers issued the Cabinet a NWP No. 14 in 2006 and again in 2007 which authorized construction of four crossings within the two mile Project. That second permit expired prior to completion of the final two crossings. Admittedly, these permits do raise some concerns, which are complicated by the passage of time and the change of circumstances. A Section 106 Process was likely due for at least one of those crossings prior to issuance of the 2006 or 2007 permits.[4] Federal defendants argue that they did perform the Section 106 Process, but that the records of it have been destroyed in the ordinary course of business. Only evidence of an archeological survey on the McGehee property remains to support the existence of the Section 106 Process.

Whether the Cabinet completed a Section 106 Process prior to issuance of NWP No. 14 in 2006 or 2007 is unclear. Plaintiffs did raise the potential NHPA violations as a defense in the state court condemnation proceedings. The state court chose not to address this claim. More

---

[4] See Footnote 2.

important, Plaintiffs did not pursue it until the Cabinet sought another NWP No. 14 in late 2010. In the intervening four years, critical events transpired. The 2006 and 2007 NWP No. 14 permits expired and the permitted construction was completed. Consequently, the claims related to the 2006 and 2007 NWP No. 14 are most likely moot. *See Comm. to Save Cleveland's Huletts*, 163 F.Supp. 2d at 788; *but see Slater*, 243 F.3d at 277 and *Harrison*, 2009 WL 3347109, at *1 n.1.

In late 2010 the Cabinet did apply for another NWP No. 14 to cover the remainder of the Project which included two unbuilt culvert crossings. At this point in time, the Cabinet initiated a Section 106 Process. The State Historic Preservation Officer stated objections to the Corps' conclusions. Such objection would necessitate further consultation under the Section 106 Process. *See, e.g.,* 36 C.F.R. §800.4(d)(1)(ii). However, the Cabinet decided to redesign the final two crossings from culverts to clear span bridges, which would not require a federal permit of any kind. Logic suggests that if the work can proceed without a permit, the Section 106 Process which the permit triggers cannot be required. Therefore, the Corps was correct to stop the Section 106 Process.

Considering the legal analysis above, to grant a preliminary injunction would be highly speculative. The Court cannot find any clear legal error in denying the preliminary injunction motion.

Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Plaintiffs' motion to alter or amend the previous order is DENIED.

cc: Counsel of Record